FILED
2020 Feb-05 AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Civil Action Number |
| ) | 5:19-cr-00233-AKK-SGC |
| MARSHALL PLOTKA, MD, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Dr. Marshall Plotka, a physician who had a practice in the Huntsville, Alabama area, is under indictment for making his house available to others for the purpose of using controlled substances in violation of 21 U.S.C. § 856(a)(2). Dr. Plotka has filed motions: (1) to dismiss the indictment for violating his right to freedom of association, doc. 25; (2) to dismiss the indictment as duplicitous, doc. 26; (3) for a bill of particulars, doc. 27; (4) to suppress evidence obtained as a result of a warrantless search of his Apple account, doc. 28; and (5) to amend his first motion to dismiss to add the claim that § 856(a)(2) is unconstitutional, doc. 36. As explained below, except for the motion to amend which the court will grant, the motions are due to be denied.

## I. Background

The government accuses Dr. Plotka of allowing others to use drugs at his house at 3107 Chamlee Place. Doc. 8 at 2. He allegedly permitted a number of

young women, whom he often hired as prostitutes, to live at his house, where the women used heroin, methamphetamine, cocaine, alprazolam (a.k.a. Xanax), and marijuana. *Id.* at 2–3. Dr. Plotka provided for their basic needs, and gave them money for drugs. *Id.* at 3. He also kept syringes at 3107 Chamlee Place that people used for intravenous drug use. *Id.* Multiple people overdosed on illegal drugs while at the house. *See id.* The government says this conduct took place from around January 1, 2015 to April 17, 2019. *Id.* In light of these allegations, a grand jury indicted Dr. Plotka for maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(2).[1]

## II. Analysis

### A. First Motion to Dismiss

Dr. Plotka argues that, as applied to him, the charge violates his right to freedom of association. Doc. 25 at 1. Noting that the indictment does not allege that he used drugs himself, Dr. Plotka argues that the government is prosecuting him merely for "invit[ing] people whom he knew to be drug addicts into his home." *Id.* at 3. In this way, he says, "the government is using the criminal code to regulate whom [he] may associate with [in] his own home." *Id.*

---

[1] In full, § 856(a)(2) states that it shall be unlawful to "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."

2

The Constitution protects two forms of freedom of association: "intimate association" and "expressive association." *Gary v. City of Warner Robins*, 311 F.3d 1334, 1338 (11th Cir. 2002). Intimate association is the right to "maintain certain intimate human relationships." *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18. Expressive association is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for redress of grievances, and the exercise of religion." *Id.* at 618.

But the Constitution does not protect "a generalized right of 'social association.'" *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Thus, when a city "restrict[ed] admission to certain dance halls to persons between the ages of 14 and 18," it did not violate their freedom to associate "with persons outside that age group." *Id.* at 20. The Supreme Court determined that "coming together to engage in recreational dancing . . . is not protected by the First Amendment." *Id.* at 25. Similarly, the Eleventh Circuit held that an ordinance barring persons under 21 from entering liquor stores did not violate the freedom to association because "there is no generalized right to associate in alcohol-purveying establishments with other adults." *Gary*, 311 F.3d at 1338. Dr. Plotka's asserted right to associate with

drug addicts fails for the same reason—i.e., he asserts a generalized right of social association, rather than a protected activity.²

Furthermore, the statute does not actually prevent Dr. Plotka from associating with drug addicts. A person violates the statute when he (1) knowingly and intentionally makes a place he manages or controls available for use by others; (2) whose purpose is to use drugs there; (3) and the person knows of their purpose or remains deliberately ignorant of it. *See United States v. Tebeau*, 713 F.3d 955, 959–61 (8th Cir. 2013). Basically, the statute prohibits allowing others to do drugs in your home. It does not prohibit Dr. Plotka from merely inviting drug addicts into his home.

Of course, the indictment accuses Dr. Plotka of more than allowing drug use at his house. It accuses him of facilitating the drug use. For example, Dr. Plotka gave his guests money specifically so that they could purchase drugs. Doc. 8 at 3. And he reportedly supplies syringes for drug use as well. *Id.* The criminal complaint provides even more details about Dr. Plotka's alleged conduct. *See* doc.

---

² Dr. Plotka emphasizes that this conduct occurred at his home, but this does not change the outcome. Granted, the law is sensitive to privacy in the home. And the Supreme Court has said that fundamental rights take on an "added dimension" when the privacy of the home is at stake. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). But for the heightened protection to apply, the freedom to association (or some other fundamental right) must actually be at issue. *See id.* at 568 n.11 (noting that the Constitution does not prevent the state from criminalizing the private possession of drugs, for example, because no "fundamental liberties" are involved). And, as explained above, the freedom to association is not implicated here.

1 at 6, 7, 12, 14. As applied to Dr. Plotka, then, it cannot be said that the charges interfere with any supposed right to associate with drug addicts.

Dr. Plotka's challenge to the constitutionality of this law as exceeding congressional powers, doc. 36, also fails. The drugs at issue here are subject to the Controlled Substances Act, and are classified as schedule I, II and IV controlled substances. It is within Congress' power to regulate these substances, *see Gonzalez v. Raich*, 545 U.S. 1, 15 (2005), which Dr. Plotka purportedly provided money for their purchase, provided syringes for their application, and allowed his residence to be used for the purpose of unlawfully storing, distributing, and using, and at times arranged for these activities through means of interstate communication. Therefore, Dr. Plotka's motion to dismiss the indictment, doc. 25, as amended, is due to be denied.

**B. Second Motion to Dismiss**

Dr. Plotka asks the court to dismiss the indictment as duplicitous. Doc. 26. The government charged Dr. Plotka with a single count of maintaining a drug-involved premises in violation of § 856(a)(2). The government charged the violation as a continuous offense that spanned over four years. Dr. Plotka maintains that § 856(a)(2) does not create a continuous offense, so the government should have charged him with a separate count for each violation. The issue, then, is whether § 856(a)(2) creates a continuous offense.

5

The federal rules require a separate count for each offense. *See* Fed. R. Crim. P. 8(a). An indictment is duplicitous when it "charges two or more 'separate and distinct' offenses" in a single count. *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997) (citation omitted). "A duplicitous count poses three dangers: (1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." *Id.* (citation omitted). To resolve whether a count is duplicitous, the court must determine "what conduct constitutes a single offense." *Id.*

Congress defines the appropriate "unit of prosecution." *Id.* (quoting *Sanabria v. United States*, 437 U.S. 54, 69 (1978)). A crime should not be construed as a continuing offense "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115 (1970). Accordingly, the court must closely examine the statute at issue.

Section 856 contains two separate but closely related offenses: § 856(a)(1) and § 856(a)(2). Critically for the issue before the court, the Ninth Circuit has held that § 856(a)(1) may be charged as a continuing offense, *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013), while the Fifth Circuit has held that § 856(a)(2),

which Dr. Plotka is charged with violating, does not have to be charged as a continuing offense, *United States v. Cooper*, 966 F.2d 936, 944–45 (5th Cir. 1992). Statutes should be interpreted as a whole, in light of their context, so as to produce a harmonious result. *In re Shek*, -- F.3d --, 2020 WL 372995, *4 (11th Cir. Jan. 23, 2020). Thus, to resolve this issue, and to make sense of these seemingly contradictory out-of-circuit precedents, the court will consider both provisions of § 856.

>Section 856(a)(1) makes it unlawful to:
>
>knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance.

In other words, the statute makes it a crime for a person to use any place—it does not have to be a place the person manages or controls—for the purpose of manufacturing, distributing, or using drugs. Crucially, the person must have the purpose of manufacturing, distributing, or using drugs at the place; "[i]t is not sufficient that others possess the requisite purpose." *United States v. Clavis*, 956 F.2d 1079, 1090 (11th Cir. 1992).

>Section 856(a)(2), in contrast, makes it unlawful to:
>
>manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

Plainly, the provisions closely track one another. However, there are two main differences. First, for § 856(a)(2), the person must "manage or control" the place at issue. In addition, "§ 856(a)(2) does not require the person who makes the place available to others for drug activity to possess the purpose of" manufacturing, storing, distributing, or using drugs. *United States v. Chen*, 913 F.2d 183, 191 (5th Cir. 1990). Instead, Congress designed the offense "to apply to the person who may not have actually opened or maintained the place for the purpose of drug activity, but who has knowingly allowed others to engage in those activities." *Id.* at 190. That is, the person knowingly allowed others who had the requisite purpose to use the place.

In *United States v. Mancuso*, the defendant was charged and convicted of a single count of violating § 856(a)(1) over a period of over seven years. The defendant argued that charging the violation as a continuous offense was duplicitous. *Mancuso*, 718 F.3d at 787. The Ninth Circuit held that the indictment "properly charged Mancuso with the continuing offense[] of . . . maintaining a drug-involved premises." *Id.* at 792. The Court reasoned that the offense was continuing because "the crime begins when a person begins maintaining a place for such purposes and continues until the person ceases to maintain the place for those reasons." *Id.*

8

The Fifth Circuit seemingly reached a different result in *United States v. Cooper*, where the defendant was charged with and convicted of six counts of violating § 856(a)(2).[3] *Cooper*, 966 F.2d at 942. The defendant argued that the indictment was multiplicious,[4] and that the government should have charged him with a continuous offense as a single count. *Id.* The defendant thus made the converse argument of the one Dr. Plotka advances here. For its part, the government argued that under § 856(a)(2),

> Congress has defined the allowable unit of prosecution by reference to the number of times the defendant 'rents,' 'lease,' or 'makes available' a building for drug-related activities. In essence, if the defendant makes the building available once, *independent of the length of time*, he has committed only one crime. If he makes the building available on more than one occasion, however, the defendant has committed multiple crimes.

*Id.* at 943 (emphasis added).

The Fifth Circuit agreed with the government's theory. The Court concluded that the statute "is properly interpreted to provide that each unlawful 'making available' of a building is a distinct offense." *Id.* at 945. But it is important to note the Court's reasoning. Six different counts were justified because, "on at least six occasions, narcotics officers legally searched the club, seized all drugs and

---

[3] Technically, the defendant was charged and convicted of ten counts. But the government belatedly agreed on appeal that four of those counts should have been dismissed. *See Cooper*, 966 F.2d at 939.

[4] An indictment is multiplicious when it charges a single offense in multiple counts, raising the risk "that a defendant will receive more than one sentence for a single offense." *Cooper*, 966 F.2d at 942 n.9.

9

firearms, arrested the suspects, and effectively closed down the crack house." *Id.* Then, "after each raid, Cooper and his accomplices returned to the Lounge, further fortified it, and resumed its operation." *Id.* For this reason, "Cooper committed a separate offense every day he made the building available." *Id.*

Dr. Plotka seizes on the Fifth Circuit's mention of "every day" to argue that the government must charge him with a separate count for each day that he allegedly made his house available for drug use. The court seriously doubts that the Fifth Circuit intended for its "every day" remark to be taken so literally. If it had, the defendant in *Cooper* should have been charged with far more than six counts, given that the activity took place over "an eight-month period." *Cooper*, 966 F.2d at 938.

Properly understood, the actual result in *Cooper* was to find that six counts, each covering an extended period of time, were appropriate. The Fifth Circuit thus effectively endorsed continuous counts. But the Fifth Circuit also acknowledged that separate counts can be warranted where the conduct is interrupted. This understanding of *Cooper* reconciles its decision with the holding of the Ninth Circuit in *Mancuso*.[5]

---

[5] In his reply, Dr. Plotka seems to embrace the same interpretation: "Each time that Dr. Plotka allegedly made his home available, whether for a day or a month or a year, is a separate criminal act. Each invitation into his home must be treated as a separate offense. And each time the invitation was concluded or interrupted, by police intervention or otherwise, the offense was complete." Doc. 32 at 7. Dr. Plotka argues that because police responded to 35 service calls at 3107 Chamlee Place—to reports of drug overdoses, for example—these calls should qualify as

10

It is also most consistent with the available guidance from the Eleventh Circuit. Though the Eleventh Circuit has not weighed in on this issue directly, it has emphasized that § 856 is intended to target repeated activity, rather than isolated incidents. In a case concerning § 856(a)(1), the Eleventh Circuit noted that one of the elements of the statute is showing "*continuity* in pursuing the manufacture, distribution, or use of controlled substances." *United States v. Clavis*, 956 F.2d 1079, 1090 (11th Cir. 1992) (emphasis added). The Court added: "An isolated instance of use, distribution, or manufacture is not a violation pursuant to this instruction." *Id.* at 1090–91. In short, the Court "construe[d] the statute . . . to exclude a single, isolated act as a violation and to embrace some degree of continuity." *Id.* at 1094.

Dr. Plotka's interpretation—that each day someone used the house illegally with his knowledge must be charged as a separate offense—would directly contradict the Eleventh Circuit's approach. It would mean that the statute *only* covers isolated incidents. That would not be a faithful interpretation of a statute that seeks to criminalize maintaining a drug-involved premises, which by its nature concerns repeated activity. The court therefore concludes that § 856(a)(2) can be

---

interrupting events requiring separate counts. As the court sees it, however, these service calls are a far cry from the sort of intervening events in *Cooper* that shut down the entire operation such that the original offense ends because the house is no longer being made available.

charged as a continuous offense, and that Dr. Plotka's motion, doc. 26, is due to be denied.

## C. Motion for a Bill of Particulars

Dr. Plotka moves for a bill of particulars identifying: (1) "The names of all persons whom the government will claim at trial used Dr. Plotka's home for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance"; and (2) "The specific dates on which the government will claim at trial that Dr. Plotka made his home available to the persons named under part [(1)]." Doc. 27 at 2.

Pursuant to Federal Rule of Criminal Procedure 7(f), the court has discretion to "direct the government to file a bill of particulars." The purpose of a bill of particulars is to "inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (citation omitted). Accordingly, the court should grant a request for a bill of particulars if "the information requested is necessary to allow the defense to prepare its case adequately or to avoid prejudicial surprise." 1 Charles Alan Wright & Andrew D. Leipold, *Fed. Prac. & Proc.* § 130 (4th ed. 2008); *see also United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985) ("[W]here an indictment fails to set forth

12

specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request for a bill of particulars may constitute reversible error.") (citation omitted).

However, criminal defendants are not entitled to "generalized discovery." *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981). And a "bill of particulars may not be used to obtain a detailed disclosure of the government's evidence prior to trial." *Davis*, 854 F.3d at 1293 (citation omitted). A bill of particulars is also inappropriate "where the information sought has already been provided by other sources, such as the indictment and discovery." *Id.* (citation omitted).

The indictment informs Dr. Plotka that the drug users to whom he made his house available "were often women that [he] hired as prostitutes." Doc. 8 at 3. The indictment continues: "He allowed these young women, their siblings, and their associates to live at 3107 Chamlee Place, and he provided for their basic needs, including food, clothing, and money. He gave them money for anything they needed, including drugs." *Id.* The indictment also alleges that Dr. Plotka "kept syringes at 3107 Chamlee Place that people used for intravenous drug use." *Id.* The criminal complaint provides Dr. Plotka with even more detail of the precise variety that he seeks from a bill of particulars. For example, the complaint refers to the names of people who allegedly used drugs at his house by their initials, cites to

specific episodes by date, and quotes from Dr. Plotka's text messages. *See generally* docs. 1, 2. Furthermore, the government has provided Dr. Plotka with extensive discovery.[6] Thus, Dr. Plotka is already in possession of the information he seeks, and his motion for a bill of particulars, doc. 27, is due to be denied.

**D. Motion to Suppress**

During its investigation, the government issued a subpoena to Apple for information associated with the account drplotka@optimumpracticesolutions.com, including associated account names, the dates those accounts were created, and the dates those accounts accessed the iCloud service. Doc. 28 at 1–2. The subpoena also sought information about what categories of information were being stored on the iCloud, such as photos, messages, and browsing history. *Id.* at 2. The subpoena did not seek the photos or messages themselves; the government obtained a warrant for that content later. Doc. 30 at 17–18.

Dr. Plotka moves to suppress any evidence obtained as a result of the subpoena. Doc. 28. He maintains that seeking this information was a search protected by the Fourth Amendment; as such, the government needed a warrant to conduct the search. The government responds that the Apple subpoena was not a

---

[6] Dr. Plotka responds that discovery is so voluminous—including over 28,000 documents and over 90,000 text messages—that it does "nothing to narrow the issues for trial in this case or to put the defense on notice of the charge." Doc. 33 at 3–4. The court is confident that Dr. Plotka has the "minimum amount of information necessary to permit [him] to conduct his own investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985). With guidance from the indictment and the complaint, the defense should be able to identify the relevant materials in the discovery.

14

search protected by the Fourth Amendment, because pursuant to the third-party doctrine, Dr. Plotka did not have a legitimate expectation of privacy in the information sought. *See Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (When a person has a legitimate expectation of privacy, an "official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.").

The third-party doctrine holds that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 2216 (citation omitted). The "doctrine largely traces its roots to" *United States v. Miller*, 425 U.S. 435 (1976). *Id.* In *Miller*, the Supreme Court held that the defendant did not have a legitimate expectation of privacy in bank records subpoenaed by the government, because the defendant "voluntarily conveyed" his financial records "to the banks," thereby assuming the risk "that the information will be conveyed by [the banks] to the Government." *Miller*, 425 U.S. at 442–43. Likewise, in *Smith v. Maryland*, 442 U.S. 735 (1979), the Court held that using a pen register—"a mechanical device that records the numbers dialed on a telephone"—was not a search. *Smith*, 442 U.S. at 736 n.1. The phone's owner did not have a legitimate expectation of privacy in the numbers dialed, because he "voluntarily conveyed [that] information to the telephone company." *Id.* at 744.

The Supreme Court recently clarified, however, that the third-party doctrine is not absolute, finding that a "person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 138 S. Ct. at 2217.[7] Noting that "an individual has a reduced expectation of privacy in information knowingly shared with another," the Court pointed out that "the fact of diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." *Id.* at 2219 (citation omitted). In other words, sharing information with a third party does not in and of itself preclude application of the Fourth Amendment. Instead, courts must consider "the nature of the particular documents sought to determine whether there is a legitimate expectation of privacy concerning their contents." *Id.* (citation omitted).

Thus, in *Carpenter*, the Court held that the defendant had a legitimate expectation of privacy in his cell-site location information ("CSLI")[8], even though

---

[7] A few years earlier, Justice Sotomayor criticized the third-party doctrine in a concurrence in *United States v. Jones*, 565 U.S. 400, 417–18 (2012):

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. . . . I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

(citation omitted).

[8] Most cell phones connect to "a set of radio antennas called 'cell sites' . . . several times a minute whenever their signal is on." *Id.* at 2211. "Each time the phone connects to a cell site, it

16

"such information is gathered by a third party." *Id.* at 2223. The Court explained that CSLI is "qualitatively different" than bank or telephone records, *id.* at 2216, and that "[t]here is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today," *id.* at 2219. CSLI conveys "not just dialed digits, but a detailed and comprehensive record of the person's movements." *Id.* at 2217. The vast amount of information captured by CSLI was decisive to the Court's decision:

> Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. . . . [T]he time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations. . . . Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for [up to] five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. Only the [vanishingly] few without cell phones could escape this tireless and absolute surveillance.

*Id.* at 2217–18 (citation omitted). Given "the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection," the Court concluded that its collection by a third party "does not make it any less deserving of Fourth Amendment protection." *Id.* at 2223.

---

generates a time-stamped record known as" CSLI. *Id.* The CSLI thus provides an "increasingly precise" snapshot of where the phone is at any given time. *Id.* at 2212.

17

Here, the information sought by the Apple subpoena—the names of associated accounts, the date they were created, and what types of records are kept on its iCloud—is not nearly as invasive as that sought in *Carpenter*. The nature of the information sought is much more comparable to the bank records sought in *Miller* and the pen register used in *Smith*. And the *Carpenter* Court explicitly declined to overturn those cases. *Id.* at 2220. The motion to suppress, doc. 28, is therefore due to be denied.

### III. Conclusion and Order

Consistent with this opinion, the motion to amend, doc. 36, is **GRANTED**. However, the first motion to dismiss, doc. 25, as amended, the second motion to dismiss, doc. 26, the motion for a bill of particulars, doc. 27, and the motion to suppress, doc. 28, are **DENIED.**

**DONE** the 5th day of February, 2020.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE